Filed 6/29/22  P. v. Casares CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JESUS CASARES,<br><br>    Defendant and Appellant. | F079797<br><br>(Super. Ct. No. BF174063A)<br><br>**OPINION** |

        APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

        Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

        Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

After forcing his way into an apartment on October 8, 2018, defendant Jesus Casares grabbed an 11- to 12-inch pointed nail and held it up as if to stab victim R.H.[1]  A jury convicted defendant of burglary, assault with a deadly weapon, and resisting a police officer and found true allegations a nonaccomplice was present during the crime and that the crimes were committed for the benefit of a gang.

Defendant contends on appeal that (1) the evidence was insufficient to support his conviction for assault with a deadly weapon because defendant failed to "do anything" with the nail before he was disarmed by R.H., (2) the trial court erred in failing to define "deadly weapon" in its instruction to the jury, and (3) we should strike five 1-year prior prison term enhancements in light of recent amendments to Penal Code[2] section 667.5, subdivision (b).  In supplemental briefing, defendant contends that we should reverse the true finding on defendant's five-year gang enhancements in light of recent amendments to section 186.22, overturn his conviction, and remand for retrial in light of recently enacted section 1109, which requires bifurcation of the gang enhancement when requested by a defendant.

The People concede that defendant is entitled to the benefit of recent amendments to sections 667.5 and 186.22 but oppose retroactive application of section 1109 and argue that any failure to bifurcate was harmless in any event.  We accept the People's concession but reject defendant's remaining arguments.  We shall strike the prior prison term enhancements, reverse the true findings on the gang enhancements, and remand for further proceedings but affirm the judgment otherwise.

---

[1]    Pursuant to California Rules of Court, rule 8.90 and for clarity and convenience because some individuals share a last name, we refer to certain persons by their first names and/or initials.  No disrespect is intended.

[2]    Undesignated statutory references are to the Penal Code.

# PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an information on October 25, 2018,[3] charging defendant with burglary of an inhabited dwelling with intent to commit a felony (§ 460, subd. (a); count 1), assault with a deadly weapon (§ 245, subd. (a)(1); count 2), and resisting a police officer (§ 148, subd. (a)(1); count 3), a misdemeanor. As to count 1, the amended information further alleged that another person, other than an accomplice, was present in the apartment during the burglary, making the offense a violent felony (§ 667.5, subd. (c)(21)). As to both counts 1 and 2, the amended information alleged that the crimes were committed for the benefit of a criminal street gang (former § 186.22, subd. (b)(1)) and that defendant had a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), a prior serious felony conviction (§ 667, subd. (a)), and served five prior prison terms (former § 667.5, subd. (b)).

On April 25, 2019, after a nine-day trial, the jury convicted defendant of all charges and found true all enhancements. Defendant waived a jury determination on his prior convictions, and the trial court found true the prior conviction allegations.

On July 11, 2019, the trial court denied probation and sentenced defendant to the upper term of 12 years in prison as to count 1 (§§460, subd. (a), 667, subd. (e)), plus 10 years (former § 186.22, subd. (b)(1)), plus five years (§ 667, subd. (a)), plus five years (former §667.5, subd. (b)), for a total term of 32 years. As to count 2, the trial court sentenced defendant to an upper term of eight years (§§ 245, subd. (a)(1), 667, subd. (e)), plus five years (former § 186.22, subd. (b)(1)) but stayed the term pursuant to

---

[3] The information was later amended on April 25, 2019, to correct clerical errors in describing defendant's prior convictions.

section 654. As to count 3, the trial court sentenced defendant to a concurrent term of one year (§ 148, subd. (a)(1)).[4]

The court imposed a $10 crime prevention fine (§ 1202.5), a $300 restitution fine (former § 1202.4, subd. (b)), a stayed $300 parole revocation restitution fine (§ 1202.45, subd. (a)), victim restitution as determined by probation (former § 1202.4, subd. (f)),[5] an aggregate $120 court operations assessment (§ 1465.8), and an aggregate $90 criminal conviction assessment (Gov. Code, § 70373).[6]

This timely appeal followed on August 14, 2019.

## FACTS

In the afternoon of October 8, 2018, police performed a probation search at Jessica Barraza's apartment in Bakersfield (the apartment). Phillip Aguilar, who was a member of the Colonia Baker street gang, Ruth M., and Ruth's child also resided there. The apartment was used by several people to socialize, drink, and use drugs. During the search, Officers Nicole Madsen and Kyle McNabb noticed that the two doors to enter the apartment were not damaged. Barraza was arrested after the search.

---

**4**    The July 11, 2019 minute order erroneously reflects that the trial court sentenced defendant to 180 days in county jail and not one year. However, the trial court imposed a concurrent sentence of 180 days in case No. BV009736A for defendant's violation of postrelease supervision after sentencing defendant on the instant case. The trial court shall amend the minute order to reflect the court's oral pronouncement of one year as to count 3. When a discrepancy exists between a trial court's oral pronouncement of judgment and the minute order, the oral pronouncement controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

**5**    The court ordered probation to determine the amount of restitution and that it be paid to the Restitution Fund in the State Treasury for California Victim Compensation and Government Claims Board reimbursement to the victim (former § 1202.4, subd. (f)(2)).

**6**    The July 11, 2019 minute order fails to reflect that the trial court ordered defendant to pay a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 2. The trial court shall amend the minute order to reflect the court's oral pronouncement of the aggregate $120 court operations assessment (§ 1465.8) and aggregate $90 criminal conviction assessment (Gov. Code, § 70373). (See *People v. Mitchell*, *supra*, 26 Cal.4th at p. 185.)

R.H. was inside the apartment later that evening. While in the bedroom, he heard banging on the living room door.[7] R.H. heard defendant angrily demanding to be let into the apartment and Ruth's voice responding. Within a minute or two, the banging stopped and R.H. heard the door open. Defendant had kicked in the door. R.H. then heard defendant yelling and rambling while inside the apartment.

As R.H. left the bedroom, he picked up an 18-inch crowbar from the hallway in order to protect himself, Ruth, and her child as he entered the room where defendant was standing. As they moved toward the kitchen, defendant picked up an 11-inch nail, approximately two to three centimeters thick, and used it to try to intimidate R.H. Defendant held the nail in a low and ready position with the head close to his wrist and approximately nine inches exposed with the pointed end toward R.H. as if to stab him.

Defendant was upset and accused R.H. of trying to run him out of the apartment. Later, while outside, defendant told R.H. that he would have stabbed R.H. with the nail. R.H. told defendant that if defendant intended to do something, then to just do it. R.H. testified, "I felt that either I'm going to get stabbed with the nail, or I could take it from him, or I could either hit him with the crowbar and we can go on from there." R.H. felt defendant would stab him if he was not quick enough. R.H. distracted defendant and grabbed the nail from him. R.H. either pushed defendant from the apartment or verbally ordered him out. While defendant was angry and verbally resisted, he did leave the apartment and was only inside for a minute or two.

R.H. followed defendant, who was still angry and yelling, outside with the crowbar. R.H. next saw that defendant had a knife and yelled that he wanted to have a knife fight. R.H. went back into the house and heard defendant yelling with Carmen H. outside. Ruth was on the telephone with the police.

---

[7]     The apartment has two doors—one leads into the kitchen and the other leads into the living room. The kitchen door is accessed from an alleyway on the side of the apartment but does not actually open.

R.H. did not know that defendant was a member of a gang but learned it that night when defendant yelled that he was from Los Primos, a subset of the Loma Bakers, and that there was no point in trying to prevent what was going to happen because of his status. R.H. did not want to testify and was in custody because he violated a court order to remain in the courthouse to testify the prior week.

Carmen arrived at the apartment in the evening. She testified that she was under the influence of drugs at the time and found it difficult to remember the events of that evening. Defendant, looking upset and angry, was knocking on and hitting the screen door for at least 30 minutes. He was trying to get into the house. Carmen told the police that defendant had caused the damage to the door but testified that the screen door had been damaged before that and allowed people to put their hands through the screen to turn the knob.

Carmen also saw defendant trying to get into the apartment from the screen door that opened into the alley and jumping up and down on a van that was parked there. She never saw defendant enter the apartment. R.H. was arguing with defendant from inside the apartment through the door. Defendant yelled out "Loma," the name of the local gang, while banging on the door. Defendant also yelled out, "I'm going to get you, motherfucker." She did not know if defendant saw the police or not, but after a police car arrived, he was gone.

Responding to the apartment again later that evening in her patrol car, Officer Madsen saw three individuals in the alley, illuminated by lights of a nearby store. Defendant ran, and she chased him on foot, into the apartment complex where two other officers apprehended him.

Officer McNabb, upon returning that evening, noted that the metal access door on the west side now was damaged in the area of the wire netting near the knob and the wooden door had splintered and showed signs of forced entry. Officer McNabb

6.

encountered defendant at the front of the apartment. During the conversation that followed, defendant admitted to being a member of the Loma Bakers and claimed he still had a good reputation and respect within the gang. Defendant also told Officer McNabb that area was defendant's "hood" and he would act if something was happening that he did not like. When asked why he was at the apartment, defendant said that he went there to see his girlfriend, Monica Hernandez, because he was concerned that she was involved in criminal activity at the apartment. Defendant explained that he used to hang out at the apartment until the criminal activity commenced. Defendant then alluded that sexual misconduct involving children was taking place at the apartment. He said that he was fine with girl on girl and boy on boy, but not when it involves children, and that he did not want Monica involved in that activity.

Defendant also expressed unhappiness that someone had called the police. Officer McNabb testified that defendant felt disrespected and said, "But I'm not gonna—I'm not gonna let these mother fuckin' people fuckin' rat me out like that and think that—that—that—that I'm cool with that. Nah, I'm not cool with that. There's a lot of things going on on these whole fucki' streets, you know .…" However, defendant denied kicking in the door or entering the apartment and said he was trying to visit his girlfriend.

Officer McNabb interviewed both Carmen and R.H. At that time, he saw the nail at the apartment, which was approximately 12 inches long. The nail had a sharp end capable of stabbing and a head at the other end (for receiving blows from a hammer). Officer McNabb testified that Carmen did not appear to be under the influence of drugs at the time that he spoke with her, but she was flustered, distraught, and afraid. She was hesitant to answer questions or be perceived as a "snitch." Carmen told Officer McNabb that defendant kicked in the door to the apartment. She saw defendant stabbing the screen door with a knife and heard defendant yelling that he would stab R.H. Carmen

7.

also reported that defendant repeatedly yelled, "Loma," and yelled at R.H., "I'll get you motherfucker."

The parties stipulated that the Loma Bakers is a criminal street gang within meaning of section 186.22.  In addition to defendant's admission to Officer McNabb that he was a member of the Loma Bakers, defendant also previously admitted he was a member of the Loma Bakers to a police officer in December 2011.  Two officers who had contacted defendant in January and December 2011 testified that defendant had "Bakers" tattooed on his stomach, elbow, and left arm and also had "LP" (Los Primos, a subset of the Loma Bakers) tattooed on his leg and right arm.  Bakersfield police officers also testified that defendant had "Hillside" (another subset of the Loma Bakers) tattooed on his upper lip.

Officer Christian Hernandez provided expert testimony that the Loma Bakers gang is a Sureño Hispanic gang in Bakersfield.  He described the geographical boundaries of the gang, its hierarchy, and the manner in which a gang benefits from the crimes of its members.  Officer Hernandez testified that the Loma Bakers is involved in criminal activities, including assaults with deadly weapons, threats, auto thefts, witness intimidation, and burglaries.  Officer Hernandez explained how such crimes will deter witnesses from reporting those and other crimes.  He further explained that gang members will become violent and retaliate if not given proper respect.

Officer Hernandez also described the symbols and tattoos associated with the gang and the subsets of the gang, including Hillside.  He later testified as to tattoos possessed by defendant that demonstrate his association and membership in the gang.  Officer Hernandez testified as to the gang-related significance of defendant's statements regarding his neighborhood during the crimes and that the location of the crimes were within the gang's territory.  Defendant's references to "Loma" during the crimes indicated that defendant was "representing" the gang and intimidating witnesses so they

8.

would not report his crimes. Officer Hernandez testified that Carmen's memory lapses while testifying could be an indication that she was frightened of the gang. Officer Hernandez described his efforts to obtain R.H.'s presence at court and R.H.'s reluctance to testify and concluded it was consistent with the fear that a gang instills to prevent witnesses from cooperating in the prosecution of gang members.

Monica testified that defendant was her boyfriend and they had been together since being introduced by her cousin, Barraza, in 2016. Monica had lived there for a few months in 2018, but by October 2018 she would go there to smoke weed and drink. About noon on October 8, 2018, Monica and defendant were at the apartment, as were R.H., Ruth, and Barraza. She and defendant argued because defendant believed she was unfaithful. She was very upset and left the apartment after telling Barraza she was leaving. Barraza called Monica later, while in custody, and asked Monica to return to the apartment. Monica returned and saw defendant with the police.

Ace Pierce, a private investigator and bail bondsmen, testified for defendant and provided his expert opinion that defendant's crimes were not committed for the benefit of the gang because it was a personal domestic matter. Pierce admitted, however, that if a gang member yelled the name of a gang while committing the crime, then the gang member was there representing the gang.

## DISCUSSION

### I. The Evidence Was Sufficient to Support Defendant's Conviction for Assault with a Deadly Weapon

#### A. Standard of Review and Law

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the

9.

defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142.)

"Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished .…" (§ 245, subd. (a)(1).) "As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028–1029.)

The Supreme Court, in the case *In re B.M.* (2018) 6 Cal.5th 528 (*In re B.M.*), clarified the law with respect to assault with a deadly weapon when the object used is not an inherently deadly weapon and distilled three principles to be applied in such cases: (1) "the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "*likely to produce* death or great bodily injury" ' " (*id*. at

10.

p. 533);[8] (2) consideration as to whether a serious injury was likely (even if it did not come to pass) must rest on evidence of how the object was actually used and not "conjecture as to how the object could have been used" (*id*. at p. 534);[9] and (3) "limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm," even though actual injury is not necessary for conviction (*id*. at p. 535).

## B.    Analysis

Viewing the evidence in the light most favorable to the judgment, as we must, we conclude defendant used the nail in a manner capable of causing and likely to result in great bodily injury.  Here, defendant kicked in the door to the apartment to gain entry and then yelled angrily in the living room.  He picked up an 11- to 12-inch nail and held it in a low and ready position, with the pointed end at R.H., obviously to use as a weapon while confronting R.H., who was holding a crowbar.  R.H. testified that defendant was upset at R.H. and believed defendant wanted to intimidate him.  R.H. further testified that defendant held the weapon in such a way to suggest that defendant intended to stab him with it.  Because they were so close together, R.H. thought he would be stabbed if he did not take the nail from defendant.  Defendant admitted that he intended to stab R.H.  An officer who saw the weapon testified that it could definitely be used to stab someone.

---

[8]    The court rejected the Attorney General's arguments that "likely to produce" essentially meant "possible" or "increasing the likelihood" of ("[a]n increase in likelihood from impossible to unlikely, for example, does not show that the object was likely to cause serious harm") and requires more than a mere possibility that serious injury could have resulted from the way the object was used. (*In re B.M.*, *supra*, 6 Cal.5th at pp. 533–534.)

[9]    "Although it is inappropriate to consider how the object could have been used as opposed to how it was actually used, it is appropriate in the deadly weapon inquiry to consider what harm could have resulted from the way the object was actually used" and "necessarily calls for an assessment of potential harm in light of the evidence.  As noted, a mere possibility of serious injury is not enough.  But the evidence may show that serious injury was likely, even if it did not come to pass." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.)

Defendant acknowledges that he "picked up the nail in reaction to [R.H.] holding the crowbar at 'a high ready position', and then pointed it at [R.H.] while standing in a low ready position, trying to intimidate Hurtado." He argues, however, because "there is no evidence that [he] did anything with the nail until [R.H.] took it from him," the evidence does not show that defendant used it in a manner that was capable of, and likely to, produce death or great bodily injury. We disagree.

Reading the facts in favor of the jury's verdict, defendant broke into the apartment and brandished an 11- to 12-inch pointed nail within striking distance of R.H., demonstrating an intent to use it as a weapon to stab R.H. (See *People v. McCoy* (1944) 25 Cal.2d 177, 193 [" 'The drawing of a weapon is generally evidence of an intention to use it.' "].) Holding the 11- to 12-inch pointed nail in a low and ready position constitutes actual use of the object in a manner capable of producing and likely to produce death or great bodily injury. "It was not necessary that the prosecution introduce evidence to show that [defendant] actually made an attempt to strike or use the [nail] upon" R.H. in order to convict defendant of assault with a deadly weapon. (*Id*. at p. 189, italics omitted.)

In *McCoy*, the defendant held a knife suspended above the victim's face and said, " 'Don't make any noise or I'll use this knife.' " (*People v. McCoy*, *supra*, 25 Cal.2d at p. 182.) The victim was able to free herself, and the defendant never made a stabbing motion at her, but the Supreme Court upheld his conviction of assault with a deadly weapon. (*Id*. at pp. 190–192.) The court found that these circumstances justified the conclusion that the defendant "had the *ability to commit a violent injury with the knife*" even without "[p]roof of an attempt to strike or use the knife" (*id*. at p. 191) because defendant's "intent as evidenced by his actions was for the jury to decide" (*id*. at p. 192). Similarly, in *People v. Bernal* (2019) 42 Cal.App.5th 1160, the victim testified that he first saw Bernal with a knife when he would not move out of Bernal's way, " 'So at that

12.

point when he brandished the knife I probably backed up about a foot or two.' " Bernal also asked, " 'Do you want to do this?' " and the jury could "reasonably conclude that the car owner would likely have been touched with the knife had he not moved out of the way." (*Id*. at p. 1168; see *People v. Vorbach* (1984) 151 Cal.App.3d 425, 429 [rejecting the defendant's argument that "the mere display of the knife without an affirmative attempt to commit a battery (i.e., a lunge)" was insufficient evidence as a matter of law to sustain a conviction].)

In *People v. Chance* (2008) 44 Cal.4th 1164, the Supreme Court discussed this concept in relation to "the present ability element" and its contemplation of an " 'immediate' injury.' " (*Id*. at p. 1171.) The court explained that " '[t]he intention must be to commit a present, and not a future injury, upon a different occasion. The acts done must be in preparation for an immediate injury.' " (*Ibid*., quoting *People v. McMakin* (1857) 8 Cal. 547, 548.) "Thus, it is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault. There is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay. The *McMakin* court noted that assault does not require a direct attempt at violence. (*McMakin*, *supra*, 8 Cal. 547 at p. 548.) 'There need not be even a direct attempt at violence; but any indirect preparation towards it, under the circumstances mentioned, such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' (*Hays v. The People* (N.Y. Sup.Ct.1841) 1 Hill 351, 352–353, cited in *McMakin*, at p. 548.)" (*Chance*, at p. 1172.) Therefore, when defendant picked up the nail and held it "low and ready" with the pointed end toward R.H., he committed a sufficient "act" for purposes of assault because "when a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps

remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance*, at p. 1172.)

R.H. testified that defendant was upset, wanted to intimidate him, used the nail in a way suggesting that defendant intended to stab him, and was close enough that defendant could have stabbed him. R.H. thought defendant would stab him if he did not take the nail from defendant, and defendant later admitted he intended to stab R.H. The jury was free to credit R.H.'s testimony that defendant used the nail in a manner likely to produce great bodily injury.

Defendant's reliance on the facts of *In re B.M.*, *supra*, 6 Cal.5th 528 to urge a different result is unavailing. In that case, the court addressed whether the evidence was sufficient to prove that a butter knife was a deadly weapon. As part of the analysis, the court noted that the knife used was a butter knife, which was "not sharp and had slight ridges on one edge of the blade." (*Id*. at p. 536.) Here, defendant used an 11- to 12-inch pointed nail that could pierce R.H.'s body. B.M. used the knife on her sister's legs (which were covered by a blanket) and, therefore did not use the knife in a manner that hurt, or could have hurt, her sister. In *In re B.M.*, the defendant completed her battery but there was no evidence that B.M. attempted to use the knife on any exposed part of her sister's body and the "moderate pressure that B.M. applied with the knife was insufficient to pierce the blanket, much less cause serious bodily injury to [her sister]." (*Ibid*.) The court found relevant that B.M. focused use of the knife on the area of her sister's body covered by the blanket as an indication that she did not use or intend to use the butter knife as a deadly weapon. (*Ibid*.) The nature of the weapon (a rounded butter knife) was only capable of and likely to inflict great bodily injury if B.M. used the knife in the area of her sister's face, but B.M. used the knife on her sister's legs, which were covered with a blanket that the knife would never be able to penetrate. Here, defendant had not yet completed the battery, and stabbing R.H. anywhere was likely to cause him great bodily

14.

injury in view of the pointedness of the nail and its length. Defendant's 11- to 12-inch nail was pointed enough to pierce R.H.'s body, R.H.'s body was not protected by anything that would have stopped the progress of the nail had defendant made contact, R.H. believed he would be stabbed, and defendant admitted he intended to stab R.H.

To be guilty of assault with a deadly weapon, defendant must do an act with an object that "by its nature would directly and probably result in the application of force to a person" (CALCRIM No. 875), and that object must be capable of producing and likely to produce death or great bodily injury based upon the manner in which defendant actually used it and the resulting injury that could or did result. (*In re B.M.*, *supra*, 6 Cal.5th at pp. 533–535.) The jury, therefore, looks both to defendant's act with the object and then whether the act would have resulted in the use of force on the person that could and would likely cause great bodily injury or death. Defendant's argument conflates both inquiries and would result in the need for a completed battery in order to determine whether the requisite level of injury occurred. An act that results in an incomplete battery is unlikely to meet the requirements of *In re B.M.*, as defendant interprets the case. Defendant in this case grabbed the 11- to 12-inch pointed nail and held it in a threatening manner to use it to stab R.H. If defendant stabbed R.H. with the nail, it would be both able to and likely to inflict great bodily injury or death if it pierced any part of R.H.'s body.

We believe this case is similar to *People v. Simons* (1996) 42 Cal.App.4th 1100 (*Simons*), a case the Supreme Court cited with at least implicit approval in *In re B.M.* (See *In re B.M.*, *supra*, 6 Cal.5th at pp. 535, 538.) Simons held several armed police officers at bay with a screwdriver (*Simons*, at p. 1106), an object the court described as "not an inherently deadly weapon" (*id.* at p. 1107). Although instructed to drop the tool, Simons flailed it about and urged the officers to shoot him. (*Id.* at p. 1106.) On those facts, the court found that for purposes of the crime of exhibiting a deadly weapon to

prevent arrest (§ 417.8), "[t]he evidence clearly demonstrated that the screwdriver was capable of being used as a deadly weapon and that [Simons] intended to use it as such if the circumstances required." (*Simons*, at p. 1107.)

Like a screwdriver, an 11- to 12-inch nail is not an inherently deadly weapon. But like the defendant in *Simons* who used the screwdriver to keep police officers at bay, defendant grabbed the nail during his angry encounter with R.H. and held it in such a way to be ready to use it to stab R.H. As with *Simons*, defendant did not actually strike R.H. so there were no resultant injuries because R.H. was able to disarm him. But, as the Supreme Court made clear in *In re B.M.*, we may consider the injuries that likely would have resulted from the way defendant actually used the nail. (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) From the way defendant wielded the nail, we conclude there was more than a mere possibility R.H. would have suffered great bodily injury if defendant had succeeded in striking him and, therefore, the evidence supports the conclusion defendant used the nail in a manner that was both capable of producing and likely to produce great bodily injury. (See *id*. at pp. 534–535.)

An object can be a deadly weapon even if it does not actually produce a deadly result or grievous injury; there are many cases affirming convictions of assault with a deadly weapon when the object used was "some hard, sharp, pointy thing that was used only to threaten, and not actually used to stab." (*People v. Page* (2004) 123 Cal.App.4th 1466, 1471–1472 [pencil held against throat was a deadly weapon]; see *People v. Hughes* (2002) 27 Cal.4th 287, 383 ["four-inch-long sharp and pointed pin, described as 'lethal' under certain circumstances, qualified as a deadly weapon"]; *In re D.T.* (2015) 237 Cal.App.4th 693, 699–700 [knife with a sharp blade more than two and one-half inches long]; *People v. Simons*, *supra*, 42 Cal.App.4th at pp. 1106–1107 [screwdriver a deadly weapon when brandished at police officers]; *People v. Savedra* (1993) 15 Cal.App.4th 738, 741 [sheriff's deputy opined that rusty unsharpened, unaltered nail

with about three inches of the nail sticking out from toilet paper handle was a " 'shank,' a jail-made device used for stabbing or slashing"]; *People v. Harris* (1950) 98 Cal.App.2d 663 [a six-inch, steel chisel with broken wooden handle and sharpened point]; *People v. Crenshaw* (1946) 74 Cal.App.2d 26, 27 [six-inch beveled file].)

The record thus contains substantial evidence defendant assaulted R.H. with an object that was both capable of producing and likely to produce great bodily injury if used to stab R.H. as defendant intended.

## II.    The Trial Court's Error in Instructing the Jury as to the Elements of Assault With a Deadly Weapon Was Harmless

Defendant argues that the trial court committed instructional error by failing to define "deadly weapon" for the jury.  The People concede the error.  However, we agree with the People that the error was harmless beyond a reasonable doubt.

### A.    Background

The trial court instructed the jury with CALCRIM No. 875 on assault with a deadly weapon in relevant part as follows:

> "One, [] defendant did an act with a deadly weapon, other than a firearm, that by its nature would directly and probably result in the application of force to a person;

> "Two, [] defendant did that act willfully;

> "Three, when [] defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone;

> "Four, when [] defendant acted, he had the present ability to apply force with a deadly weapon to a person;

> "And five, [] defendant did not act in self-defense."

CALCRIM No. 875 includes several bracketed sections that the court did not include when instructing the jury including, as relevant here, the following:

17.

"[A deadly weapon other than a firearm is any object, instrument, or weapon [that is inherently deadly or one] that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.]

"[An object is inherently deadly if it is deadly or dangerous in the ordinary use for which it was designed.]

"[In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.]"  (CALCRIM No. 875, italics omitted, brackets in original.)

The Bench Notes to CALCRIM. No. 875 direct the trial court to provide the bracketed definitions where relevant and cautions that the phrase and definitions relating to an "inherently deadly" weapon should not be given unless the weapon is inherently dangerous as a matter of law.  (Judicial Council of Cal., Crim. Jury Instns. (2020) Bench Notes to CALCRIM No. 875, p. 629.)

### B.    Standard of Review and Applicable Law

Trial courts have a sua sponte duty to instruct " 'on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case.' "  (*People v. Simon* (2016) 1 Cal.5th 98, 143.)  A court is not required to define commonly used words with no technical meaning peculiar to the law in the absence of a request.  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1050–1051.)  Where the nonlegal meaning of a word or phrase is different from that of its legal meaning, the court is required to clarify the meaning for the jury.  (*People v. Jennings* (2010) 50 Cal.4th 616, 670.)

Defendant argues, and the People concede, that the trial court erred when it did not define the term "deadly weapon" for the jury because the nail was not an inherently deadly weapon.  The failure of the court to adequately instruct on the requirement that defendant must have used the nail as a weapon had the effect of removing from the jury's consideration an element of the crime.  The trial court's failure to instruct the jury on the definition of deadly weapon is subject to harmless error analysis under the standard of

18.

*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*). (See *Neder v. United States* (1999) 527 U.S. 1, 9–10, 15–16.) Under the *Chapman* standard, we "must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831.) "[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] we must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" ' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 70.)

### C. Analysis

In this case, we have no difficulty concluding that any error in failing to instruct the jury on the definition of a deadly weapon was harmless.

In the first place, the "deadly weapon" element of the charge was not substantially disputed at trial, and to the extent it was discussed by the prosecutor in closing argument, the prosecutor emphasized what defendant did with the nail, what he intended to do with it, and the great bodily injury that would have resulted if defendant had stabbed R.H. The prosecutor argued that defendant "went up, picked this up, and pointed it at [R.H.] ready to stab. Keep in mind, this is all in the same instance as [defendant] is yelling, 'I'm going to get you, motherfucker,' " The prosecutor argued further that defendant grabbed the nail to stab R.H. in close enough proximity that R.H. could take it from him, "So yes, [defendant] did do an act that by its nature would probably and directly result in the application of force to a person." The prosecutor also stated, "Absolutely [defendant] could have hurt [R.H.] with that if he had been stabbed in the stomach, or the chest, or the neck. Any place with that nail, that's going to cause some serious injuries." The prosecutor emphasized the size of the nail, its pointedness and the manner defendant used it. (See *People v. Jennings*, *supra*, 50 Cal.4th at p. 678 [the prosecutor's discussion of the missing element a factor to consider in determining prejudice].) Accordingly, if indeed

the jury reached the conclusion that defendant's nail was a deadly weapon, it would have been because the jury agreed it was used such that it was, in fact, "capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 875; see *People v. Aledamat* (2019) 8 Cal.5th 1, 14–15 [instructional error harmless because, in determining whether box cutter was inherently deadly, the jury necessarily would have found so "in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm—and that [the] defendant used it as a weapon"]; cf. *People v. Pruett* (1997) 57 Cal.App.4th 77, 86 [trial court did not err in failing to define deadly weapon because "[j]urors can certainly employ common sense and experience to determine whether or not such a knife is a 'deadly' instrument"].)

Furthermore, defendant did not dispute the capability of or likelihood of the nail to cause great bodily injury but focused on whether defendant's act would have directly resulted in the application of force: "We can argue all we want, but you won't get any instruction that says, hey, if I stand here within inches of you with an 11-inch nail, that is the act that is in this statute." "I'm telling you if you don't have an act with [an] 11-inch nail, you should not find that there was an assault that happened," "but there's no [testimony] that [defendant] moved forward with this. That he did anything but he grabbed [the nail] and held it." Defense counsel further told the jury, "So my argument is no, you have to have something, otherwise, you may have brandished or something else, but you don't have an assault."

Defense counsel also claimed that defendant was defending himself against R.H. and acknowledged that defendant "looked, saw the [nail] and pulled up this nail in response to this crowbar." Defense counsel argued, "Is it reasonable for me to arm myself just in case [R.H.]'s so mad that I've got to do something to show I'm—you just can't clock me? Yes." Defense counsel then argued that "the law is going to require something more than picking up something and holding it at the ready when another

person has their crowbar at the ready" and that defendant did not try to strike R.H. with the crowbar.

By agreeing that defendant picked up the nail to defend himself and held it in a manner consistent with that purpose, defense counsel did not challenge the capability or likelihood that the nail would have caused bodily injury but argued that holding the nail was not an act that would result in force being used against R.H. Had defendant wanted to dispute whether the nail was a deadly weapon, he could have done so. (See *People v. Merritt*, *supra*, 2 Cal.5th at p. 832 [" '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' "].)

Moreover, the jury would have found the nail was a deadly weapon anyway if it had been instructed properly. Defendant grabbed the nail during his angry encounter with R.H. and held it in such a way to be ready to use it to stab R.H. Defendant grabbed the nail to use to stab, and the length and pointedness of the nail was capable of and likely to cause great bodily injury when used that way. There is no reasonable doubt that the jury found, or would have found, that defendant used the nail in a manner "capable of causing and likely to cause death or great bodily injury," as required by CALCRIM No. 875. (See *People v. Brown* (2012) 210 Cal.App.4th 1, 13 [ample evidence that the defendant used a BB gun in a manner capable of inflicting and likely to inflict great bodily injury, as well as arguments of counsel, left no reasonable doubt the jury found the defendant guilty "on this basis and not because it concluded the BB gun, regardless of the manner in which it was used, was 'inherently dangerous' "].)

Defendant argues the error was not harmless because there was evidence that R.H. disarmed defendant before being stabbed, providing reasonable doubt as to whether the nail was capable of and likely to cause death or great bodily injury. While defendant's

21.

assault eventually ended after being disarmed, that does not negate the capability and likelihood of death or great bodily injury during his encounter with R.H. if he had stabbed R.H. anywhere, given the ability of the nail to pierce the human body and the length of the nail to do so deeply.

We conclude that any error in failing to define deadly weapon for the jury was harmless beyond a reasonable doubt and did not contribute to the verdict.[10]

## III. Assembly Bill No. 333

### A. Section 186.22

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333) amended section 186.22 to require proof of additional elements to establish gang enhancements. (Stats. 2021, ch. 699, § 3.) Defendant contends that the amendments to section 186.22 apply retroactively to his case and that we must reverse the true findings on the gang enhancements because he was convicted under a prior version of the law.[11] The People concede that the amendments apply retroactively. We agree and reverse the true findings on the gang enhancements.

#### 1. Applicable Law

A defendant who commits a felony "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" is subject to increased punishment upon conviction. (§ 186.22, subd. (b)(1).) As noted above, defendant's sentence included enhancements under a former version of this provision. Imposition of a gang

---

[10] In light of this conclusion, we do not reach defendant's alternative argument that trial counsel rendered ineffective assistance of counsel in failing to request instruction on the definition of a deadly weapon.

[11] On November 19, 2021, defendant filed a request that we take judicial notice of the legislative history underlying amendments to section 186.22. We grant this request. (Evid. Code, §§ 452, 459; Cal. Rules of Court, rule 8.252.)

enhancement now requires proof of additional elements, including that the charged offense must have "commonly benefited a criminal street gang" (§ 186.22, subd. (e)(1)) where the "common benefit … is more than reputational" (*id*. subd. (g)). With respect to common benefit, the new legislation explains: "[T]o benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (*Ibid.*)

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) The Supreme Court has expanded the application of this doctrine broadly " 'to statutes changing the law to the benefit of defendants' " and held that the presumption of retroactivity applies to laws that change the substantive requirements for an enhancement in the defendant's favor. (*People v. Sek* (2022) 74 Cal.App.5th 657, 666 (*Sek*), quoting *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 300–301 [applying recently passed initiative requiring proof of intent to kill for certain special circumstance allegations retroactively to the defendant's case that was not yet final].)

### 2. Analysis

"At least one of the amendments in Assembly Bill No. 333 clearly meets the requirements for retroactivity as outlined by these cases: To prove that a defendant committed a felony 'for the benefit of, at the direction of, or in association with a criminal street gang' (§ 186.22, subd. (b)(1)), the new law requires the prosecution to

23.

show that 'the common benefit [to the gang] is more than reputational.' (§ 186.22, subd. (g), enacted by Assem. Bill No. 333 (Stats. 2021, ch. 699, § 3).) The law thus redefines the enhancement for the benefit of the defendant…. [A]nd it therefore applies retroactively under [*In re* ]*Estrada*." (*Sek*, *supra*, 74 Cal.App.5th at p. 667; see *People v. Ramirez* (2022) 79 Cal.App.5th 48, 63–64; *People v. Perez* (2022) 78 Cal.App.5th 192, 206; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1127–1128 (*Ramos*); *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822–825; *People v. Burgos* (2022) 77 Cal.App.5th 550, 563; *People v. E.H.* (2022) 75 Cal.App.5th 467, 478–481; *People v. Delgado* (2022) 74 Cal.App.5th 1067, 1086–1088; *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033; *People v. Lopez* (2021) 73 Cal.App.5th 327, 345–348.)

The People concede that the proof offered at trial does not satisfy the new requirements of Assembly Bill No. 333 as it did not prove that defendant specifically intended to promote, further, or assist in criminal conduct by gang members in a manner that was " 'more than reputational' " as section 186.22, subdivision (g) now requires. Defendant argues that we should strike the enhancements without remand because the evidence did not show that the benefit to the gang was more than reputational. The People disagree, as do we.

The proper remedy is to remand to give the prosecution an opportunity to retry the gang enhancements under current law. (*People v. Shirley* (1982) 31 Cal.3d 18, 71 [retrial permitted where posttrial change in law invalidates certain evidence because prosecution proved its "case under the law as it then stood," having "had little or no reason to produce other evidence of guilt"]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71–72 & fn. 2 [remand appropriate to allow prosecution to establish additional element retroactively added by statutory amendment]; *People v. Lopez*, *supra*, 73 Cal.App.5th at p. 346 [vacating gang enhancements in light of Assem. Bill No. 333 and remanding for limited retrial]; *People v. Rodriguez*, *supra*, 75 Cal.App.5th at pp. 823–824 & fn. 19 [same];

24.

*People v. E.H.*, *supra*, 75 Cal.App.5th at p. 481 [same]; *People v. Delgado*, *supra*, 74 Cal.App.5th at p. 1091 [same]; *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033 [same]; *Sek*, *supra*, 74 Cal.App.5th at p. 669 [same].)

We therefore conclude that the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22.

**B.     Section 1109**

*1.     Background*

Defendant moved to bifurcate trial on the gang enhancements from the underlying offenses.  The trial court heard defendant's motion on April 11, 2019.  Defense counsel argued that gang evidence was tangential to the offenses, which were motivated by defendant's argument with his girlfriend, Monica, and his attempt to contact Monica at the residence while intoxicated.  Defense counsel acknowledged that defendant's facial tattoo and his gang-related statements during the crime were admissible as evidence on the underlying offenses.  The prosecutor argued that this evidence was relevant to the charge of burglary[12] and assault with a deadly weapon.

The trial court denied the motion after determining that the prejudicial effect of the evidence would not outweigh its probative value ("[t]he probative value seems to have a potential to be significant in this case") and would be admitted as evidence of the underlying offenses.  The trial court indicated that it would provide a limiting instruction to the jury that would mitigate the potential for improper prejudice and improper use of the evidence by the jurors.

---

[12]     Defendant was charged with burglary with intent to commit a felony and the jury was instructed that defendant intended to commit assault with a deadly weapon, assault likely to inflict great bodily injury, battery with serious bodily injury, and criminal threats.

Defendant contends this was reversable error under newly enacted section 1109 and argues his convictions on the underlying offenses as well as the findings on the enhancement allegations must all be reversed. We disagree.

### 2. *Applicable Law*

Assembly Bill No. 333 also added section 1109 to the Penal Code. (Stats. 2021, ch. 699, § 5, eff. Jan. 1, 2022.) As relevant here, under section 1109, in a case where a gang enhancement finding is alleged, the defense may demand a bifurcated trial such that "[t]he question of the defendant's guilt of the underlying offense shall be … determined" before any "further proceedings to the trier of fact on the question of the truth of the enhancement." (§ 1109, subd. (a)(1)–(2).)

The parties dispute whether section 1109 is also retroactive. Two cases have held that section 1109 is not retroactive. (See *People v. Ramirez*, *supra*, 79 Cal.App.5th at p. 65; *People v. Perez*, *supra*, 78 Cal.App.5th at p. 207.) Two cases have held that section 1109 is retroactive. (See *People v. Burgos*, *supra*, 77 Cal.App.5th at pp. 564–569; *Ramos*, *supra*, 77 Cal.App.5th at pp. 1128–1130; but see *Burgos*, at p. 569 (dis. opn. of Elia, J.) [contending that section 1109 is not retroactive].)

We assume, without deciding, that section 1109 is retroactive because we find any error in failing to bifurcate was harmless. (See *People v. E.H.* (2022) 75 Cal.App.5th at p. 480.)

Defendant argues that the failure to bifurcate trial on the gang enhancement allegations is a structural error not amendable to harmless error review. We reject that contention. When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*).) Federal constitutional errors require reversal unless the beneficiary of the error can show it was "harmless beyond a reasonable doubt."

26.

(*Chapman*, *supra*, 386 U.S. at p. 22.) But the failure to bifurcate the gang enhancement allegations from the underlying offenses will only violate defendant's constitutional due process rights if, unlike this case, it rendered his trial fundamentally unfair. (*People v. Mendoza* (2000) 24 Cal.4th 130, 162.)

The United States Supreme Court has recognized that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error. (*Chapman*, *supra*, 386 U.S. at pp. 23–24; *McCoy v. Louisiana* (2018) 584 U.S. ___,___ [138 S.Ct. 1500, 1511, 200 L.Ed.2d 821, 833] ["Structural error 'affect[s] the framework within which the trial proceeds,' as distinguished from a lapse or flaw that is 'simply an error in the trial process itself.' "].)[13] Structural errors go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence and are reversible per se—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element. (*People v. Anzalone* (2013) 56 Cal.4th 545, 554.) However, an error occurring during the presentation of the case to the jury is a trial error that can be assessed in the context of the other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. (*Ibid*. ["For example, it would be impossible to divine how a trial would have proceeded if a defendant had been allowed counsel or the trial judge not been biased."].)

Considering the principles of harmless and structural error, we are not persuaded that a failure to bifurcate under section 1109, if error, is unamenable to harmless error

---

**13** Structural errors include the total deprivation of the right to counsel (*Gideon v. Wainwright* (1963) 372 U.S. 335, 343), a biased trial judge (*Tumey v. Ohio* (1927) 273 U.S. 510, 533), unlawful exclusion of grand jurors based on race (*Vasquez v. Hillery* (1986) 474 U.S. 254, 262–264), denial of self-representation at trial (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8), denial of right to a public trial at a suppression hearing (*Waller v. Georgia* (1984) 467 U.S. 39, 49), a defective reasonable doubt instruction (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281), and a defendant's right to have all critical stages of a criminal trial conducted by a person with jurisdiction to preside (*Gomez v. United States* (1989) 490 U.S. 858, 876 [magistrate judge exceeds jurisdiction by selecting jury in a felony case]).

review. The admission of evidence on gang enhancement allegations in an unbifurcated proceeding does not affect the framework of the trial, and the effect of such admission on the outcome of a trial can be quantitatively assessed. (See *People v. E.H.*, *supra*, 75 Cal.App.5th at p. 480 [applying *Watson* harmless error analysis to § 1109]; *Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1132 [same]; see also *People v. Pinholster* (1992) 1 Cal.4th 865, 931–932 [applying *Watson* to a failure to sever a count], disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Burch* (2007) 148 Cal.App.4th 862, 868–869 [applying *Watson* to a failure to bifurcate trial on a prior conviction].)

### 3. *Analysis*

Defendant fails to demonstrate that it is reasonably probable he would have obtained a more favorable result on the underlying offenses if they had been bifurcated from the gang enhancement allegations. The evidence supporting defendant's convictions on those counts is substantial. R.H. convincingly identified defendant as his attacker, and the dangerous nature of the weapon wielded by defendant was apparent from photographs and R.H.'s description. The damage to the door where defendant entered was proven by officers who had viewed the door earlier in the day without such damage and by photographs of the door after defendant's entry. Carmen's testimony corroborated R.H.'s testimony in substantial part as to defendant's attempts to enter the apartment and his gang-related statements while doing so. The prosecution presented strong evidence that defendant was guilty of the underlying offenses regardless of the gang evidence.

"Furthermore, nothing in Assembly Bill [No. ]333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) Here, defendant's gang connection was relevant to contested issues related to several of the underlying offenses, including

his motive in entering the apartment. Similarly, both R.H. and Carmen's credibility was affected by possible fear of retaliation in light of defendant's gang connections, and this evidence was admissible on that basis as well. Thus, it is likely much of the evidence concerning defendant's gang membership and activities would have been admitted at a bifurcated trial on the underlying offenses. (See *ibid.* [" 'To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary' "], quoting *People v. Hernandez*, (2004) 33 Cal.4th 1040, 1049–1050.) Moreover, other gang evidence that might not have been admitted had the trial been bifurcated was not so inflammatory that it likely biased the jurors against defendant on the question of guilt.[14] Additionally, the trial court provided a limiting instruction to the jury regarding their consideration of the gang evidence. (See *Ramos*, at p. 1132 [" 'We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption' "], quoting *People v. Franklin* (2016) 248 Cal.App.4th 938, 953.)

For these reasons, we conclude—even assuming that section 1109 applies to him—defendant was not prejudiced by the failure to bifurcate the gang enhancement allegations from his trial on the underlying offenses.

---

[14] The gang evidence that might have been excluded from the guilt portion of the trial on the underlying offenses includes evidence of the general membership structure and activities of the Sureño gang and its general criminal activities, including assaults with deadly weapons, threats, auto thefts, witness intimidation, and burglaries. Due to the parties' stipulation that the Loma Bakers is a criminal street gang within meaning of section 186.22, the jury did not hear evidence regarding any past crimes committed by defendant or other gang members.

**IV.    Defendant's One-year Enhancements for Prior Prison Terms Shall Be Stricken**

Defendant argues that his five 1-year prior prison term enhancements must be stricken based on the retroactive application of Senate Bill No. 136.  The People agree, as do we.

Effective January 1, 2020, Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill No. 136) amended section 667.5, subdivision (b) to limit application of prior prison term enhancements to only prior prison terms that were served for sexually violent offenses as defined by Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1.)  That amendment applies retroactively to all cases not yet final on Senate Bill No. 136's effective date.  (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341–342, citing *In re Estrada*, *supra*, 63 Cal.2d at pp. 742–748.)

Here, the trial court imposed five 1-year section 667.5, subdivision (b) prior prison term enhancements for the following convictions:  (1) attempted murder (§§ 664/187, subd. (a));  (2) possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a));  (3) possession of a firearm by a drug addict (former § 12021, subd. (a)(1));  (4) obstructing or resisting an officer (§ 69);  and (5) carrying a concealed dirk or dagger (§ 21310).  The defendant's prior prison terms served for these offenses were not served for "sexually violent offenses."

On January 1, 2020, defendant's case was not yet final.  Therefore, as the parties agree, defendant is entitled to the ameliorative benefit of Senate Bill No. 136's amendment to section 667.5, subdivision (b).  Defendant's one-year sentences for these five prison terms must therefore be stricken.[15]

---

**15**    In light of resolution of this issue, we do not address defendant's argument that his attempted murder conviction cannot be used for enhancements pursuant to both sections 667, subdivision (a) and 667.5, subdivision (b).

30.

# DISPOSITION

The true findings on the former section 186.22, subdivision (b) gang enhancement allegations as to counts 1 and 2 are reversed, and the case is remanded to the trial court with directions to (1) give the People an opportunity to retry the enhancements under section 186.22, as amended by Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3), (2) resentence defendant in a manner consistent with this opinion whether the People elect not to retry the enhancements or at the conclusion of retrial, and (3) strike the five former section 667.5, subdivision (b) 1-year prior prison term enhancements.

The clerk of the court is directed to (1) amend the July 11, 2019 minute order to reflect that the trial court ordered defendant to pay a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to count 2 and sentenced defendant to one year in county jail as to count 3, and (2) amend the abstract of judgment to reflect the aggregate $120 court operations assessment (§ 1465.8) and the aggregate $90 criminal conviction assessment (Gov. Code, § 70373) imposed as to counts 1, 2, and 3.

In all other respects, the judgment is affirmed.


HILL, P. J.

WE CONCUR:


PEÑA, J.


SMITH, J.

31.